**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Jeremy Marshall, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being duly sworn, state as follows:

I. **INTRODUCTION AND AGENT BACKGROUND**

1. I am submitting this continuation in support of an application for a search warrant for information (including location information) associated with the cellular telephone assigned call number **616-890-6677** ("**Target Phone 2**"), that is stored at premises owned, maintained, controlled, or operated by Sprint Corporation, a wireless provider headquartered at 6360 Sprint Parkway Overland Park, Kansas. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. I have been employed as a Special Agent with ATF since 2008. My responsibilities include the investigation of criminal violations of Titles 18, 21, and 26 of the United States Code. I have participated in hundreds of investigations involving firearms and narcotics, which have resulted in the arrest and conviction of criminal defendants and the seizure and forfeiture of firearms, narcotics, and illegal proceeds.

4. The matters set forth in this continuation are either known personally to me or were related to me by other persons acting in their official capacities as officers and agents of the United States, the State of Michigan, and local jurisdictions within Michigan. Because it is submitted for the limited purpose of establishing probable cause to search for evidence, this affidavit does not necessarily recite all of the facts of the underlying investigation that are known to me or to other investigators at this time.

II. **PROBABLE CAUSE**

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(6) [false statement during purchase of a firearm], 18 U.S.C. § 922(d)(1) [sale or transfer of a firearm to a prohibited person], and 18 U.S.C. § 922(g)(1) [felon in possession of a firearm or ammunition] have been committed. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as further described in Attachment B.

6. In January 2021, **Anthony Dwayne Williams** and **Dwayne Kurt Droughn** both resided in the Grand Rapids area. The ATF is investigating **Droughn**'s purchase of a firearm and ammunition on January 27, 2021, which **Droughn** transferred to **Williams** that same day. As described in more detail below, shortly after the transfer, **Williams** was involved in a traffic accident in Grand Rapids. After the accident, a backpack was recovered in a nearby wooded ravine area. The backpack contained approximately 89 grams of marijuana, a digital scale, a box of ammunition missing six rounds, and an empty pistol box for a 9 mm SCCY pistol, model CPX-2TT, Serial Number C075036. Investigators determined that the ammunition and the SCCY pistol belonging to the box were purchased by **Droughn** approximately one hour before the traffic accident, at a Dunham's Sports in Grand Rapids.

### A. Traffic Accident and Recovery of Backpack with Marijuana, Ammunition, and Empty SCCY Pistol Box

7. More specifically, on January 27, 2021, at approximately 11:55 am, the driver of a Toyota Tacoma (hereinafter "Tacoma driver") called 9-1-1 and reported that he had been rear-ended by a silver Lincoln MK Z, at the intersection of Breton Ave SE and Burton Street SE ("Breton and Burton"), in Grand Rapids. The Tacoma driver further stated the driver of the Lincoln fled on foot, westbound between houses, carrying a black backpack.

8. Grand Rapids Police Department (GRPD) Officers Thomas Gootjes and Roxanne Partak responded to the dispatch of a "hit and run" accident at the intersection. When Officer Partak arrived at Breton and Burton, at approximately 12:08 p.m., she found on scene both drivers of the two vehicles involved in the accident. Officer Gootjes arrived shortly thereafter. Officers Partak and Gootjes determined that **Williams** was the driver and sole occupant of the silver Lincoln, which was registered to **Williams**.

9. The Tacoma driver told Officer Gootjes that his vehicle was struck from behind by **Williams'** vehicle. According to the Tacoma driver, **Williams** then exited the Lincoln and fled on foot, without saying anything. The Tacoma driver said that, when **Williams** fled he was carrying a backpack, but when **Williams** returned to the scene he no longer had the backpack. The Tacoma driver pointed Officer Gootjes to the location where **Williams** fled, between houses on Burton Street.

10. Around this time, Officer Partak learned that **Williams** was on federal supervised release. This information, as well as the Tacoma driver's observation that **Williams** fled the scene with a backpack and returned without it, led the officers to detain **Williams** in Officer Partak's police vehicle. Officer Partak observed that **Williams**'s pantlegs were wet and that there were pieces of snow and ice clinging to **Williams**'s pants.

11. While **Williams** was detained in Officer Partak's police vehicle, Officer Gootjes followed the footprints in the snow, through backyards of houses on Breton Road SE to a parallel street to the west, namely Ontonagon Drive SE. The footprints disappeared on the street, which had been plowed and had pack snow from vehicle tires. Around this time, a Grand Rapids Police Officer assigned to the U.S. Marshals fugitive team, Brandon Romero, drove down Ontonagon Drive SE in an unmarked police vehicle. Officer Romero reported to Ontonagon Drive because he heard the dispatch on the police radio of a hit and run near Breton and Burton,

and he heard radio traffic that the subject had fled westbound. Officer Romero was in the area and decided to check the area west of Breton Ave SE.

12. Officer Romero encountered Officer Gootjes on Ontonagon Drive SE. Officer Gootjes reported that he lost the footprints on the street. Officer Romero proceeded to drive his vehicle to the end of the dead-end street. While circling the cul-de-sac at the end of the street, Officer Romero observed fresh footprints in the snow leading into the wooded ravine area at the end of Ontonagon Drive SE. Officer Romero alerted Officer Gootjes to the footprints in the snow. Officer Gootjes observed that the footprints matched those that he followed between houses from Breton Ave SE to Ontonagon Drive SE. Officer Gootjes followed the footprints down to the ravine and partially up the other side of the ravine, where a black backpack was sitting in the snow. Officer Gootjes retrieved the backpack and searched it.

13. Inside the backpack, Officer Gootjes located several containers of marijuana, a large number of loose sandwich bags, a digital scale, a pistol box for the SCCY pistol and a partial box of Federal 115 grain FMJ (full metal jacket) 9 mm Luger training ammunition. The box of ammunition held 50 rounds and there were six missing from the box, leaving 44 rounds of ammunition. Police conducted a search of the area with a K9, but were unable to locate the SCCY pistol matching the empty pistol box.

14. Further investigation determined that **Williams** was on federal supervised release for felon in possession of a firearm and thus not permitted to be in possession of marijuana, ammunition, or a firearm. While **Williams** was detained in Officer Partak's vehicle, he denied any ownership or knowledge of the black backpack.

15. **Williams** was arrested for distribution of marijuana and felon in possession of ammunition. At the time of his arrest, two cell phones were located on his person: 1) white/gold Apple iPhone with a blue case and a blue; and 2) blue Apple iPhone with a black case.

16. During the course of **Williams**'s arrest on January 27, 2021, Officer Partak took **Williams**'s shoes. Later that day, Officer Gootjes looked at the sole of **Williams**'s shoes and determined that they matched the footprints he had followed in the snow.

### B. Droughn's Purchase of Firearm and Ammunition on January 27, 2021

17. I conducted a trace of the SCCY pistol based on the make, model and Serial Number that were listed on the empty pistol box from the backpack. The trace results showed **Droughn** purchased the pistol at Dunham's Sports located at 3665 28th Street, Suite 11, Grand Rapids, Michigan on January 27, 2021.

18. I contacted Dunham's Sports and obtained a copy of the Firearms Transaction Record (ATF Form 4473) and a receipt for the purchase. The Firearms Transaction Record for the SCCY pistol is signed by **Droughn** and dated January 27, 2021. The receipt for the pistol is timestamped January 27, 2021 at 10:51 am. The receipt is for the SCCY pistol and a box of "9mm 115GR FMJ TRAI". The total cost was $286.18 and the transaction was paid for with cash.

19. Question 21.a. on the Firearms Transaction Record asks:

> Are you the actual transferee/buyer of the firearm(s) listed on this form … Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.

**Droughn** checked the box next to "Yes", indicating he was acquiring the firearm for himself. If **Droughn** had checked no, it would have been illegal for Dunham's Sports to sell the firearm to **Droughn**.

20. The GRPD Forensics Department processed the SCCY pistol box and a usable print was recovered. The GRPD Latent Print Unit determined the print belonged to **Droughn**.

### III.  Williams's Prior Felony Convictions

21. According to his criminal history, **Williams** has the following felony convictions:

- In 2006, **Williams** pled guilty to weapons, carrying concealed in the State of Michigan 17th Circuit Court located in Kent County, case number 20065319. **Williams** was sentenced to 45 days in jail.

- In 2007, **Williams** was found guilty of home invasion – 2nd degree in the State of Michigan 17th Circuit Court located in Kent County, case number 20073784. **Williams** was sentenced to 15 months to 15 years in prison.

- In 2008, **Williams** pled guilty to unarmed robbery in the State of Michigan 17th Circuit Court located in Kent County, case number 200713176. **Williams** was sentence to 20 months to 15 years in prison.

- In 2008, **Williams** pled guilty to larceny – from a motor vehicle in the State of Michigan 17th Circuit Court located in Kent County, case number 20096427. **Williams** was sentenced to 1 to 5 years in prison.

- In 2011, **Williams** pled guilty to felon in possession of a firearm in federal court for the Western District of Michigan, case number 1:11-cr-110. **Williams** was sentenced to 84 months in prison and 3 years supervised release. In 2019 and 2021, **Williams'** supervised release was revoked and he was sent back to prison.

### IV.  Interstate Nexus of Firearm and Ammunition

22. ATF Special Agent Geoffrey Yandl examined the ammunition and determined it was manufactured by Federal Cartridges Company, which manufactures ammunition in the States of Minnesota, Arkansas, and Idaho.

23. S/A Yandl researched the 9 mm SCCY pistol and determined it was made by SCCY Industries in the State of Florida.

### V. William's Use of Target Phone 1

24. I verified with U.S. Probation Officer Thomas Mize that, on January 27, 2021, **Williams** was on federal supervised release. The address listed for Williams was 3153 Creek Drive SE, Kentwood, Michigan. According to Officer Mize, and as confirmed by records provided by Officer Mize, **Williams**'s primary contact phone number that **Williams** reported to U.S. Probation, from July 17, 2020 forward, was **616-724-7035**, *i.e.*, the number for **Target Phone 1**.

25. I reviewed records received from Sprint for **Target Phone 1**. The records showed that **Anthony Dwayne Williams** was the subscriber for the account from July 13, 2020 until May 7, 2021.

### VI. Droughn's Use of Target Phone 2

26. On July 19, 2021, Investigators interviewed **Droughn**. At that time, **Droughn** admitted to buying the SCCY pistol and claimed he left the Dunham's store bag, containing the empty pistol box and ammunition, in Williams's vehicle on January 27, 2021. **Droughn** also claimed that, sometime in or about June 2021, someone stole the SCCY pistol from the trunk of **Droughn**'s girlfriend's car. **Droughn** denied buying the pistol for **Williams** and stated that he knew Williams had a felony conviction. During the interview, **Droughn** showed investigators a Michigan State Police Pistol Sales Record for a 9 mm Taurus pistol he purchased on May 21, 2020, from a private party. The phone number listed for **Droughn** on the Pistol Sales Record was **616-890-6677**, *i.e.*, the number for **Target Phone 2**.

27. I reviewed records received from Sprint for **Target Phone 2**. The records showed that **Dwayne Droughn** was the subscriber for the account from September 21, 2019 until August 27, 2021.

### VII. Communications Between Target Phone 1 and Target Phone 2

28. I reviewed toll records from Sprint for **Target Phone 2**. The records show that there were approximately 20 calls or text messages between **Target Phone 1** and **Target Phone 2** between January 25 and January 27, 2021. This included several communications the morning of January 27, 2021—when **Droughn** purchased the SCCY pistol and box of ammunition and **Williams** was arrested, approximately one hour later, after running with the backpack containing the box of ammunition (minus six rounds) and the empty SCCY pistol box. The communications include a phone call within minutes of **Williams**'s car accident, around the time the Tacoma driver observed Williams running away from the scene of the accident.

29. In my training and experience, criminals including illegal gun traffickers make extensive use of cell phones to facilitate all aspects of their dealings, including making arrangements to steal, buy, and sell guns, and to effectuate the exchange of money for guns.

30. Based on the foregoing, I submit that **Target Phone 1** was used by **Williams** and **Target Phone 2** was by **Droughn** before and during the events of January 27, 2021 and that probable cause exists to believe information from the records of **Target Phone 1** and **Target Phone 2**, particularly cell site location information, will contain evidence of violations of 18

U.S.C. § 922(a)(6) [false statement during purchase of a firearms] and 18 U.S.C. § 922(d)(1) [sale or transfer of a firearm to a prohibited person], and 18 U.S.C. § 922(g)(1) [possession of a firearm and ammunition by a felon].

### VIII. CEULLULAR/WIRELESS PHONE PROVIDERS

31. In my training and experience, I have learned that Sprint is a company that provides wireless/cellular telephone access to the general public. I also know that providers of wireless telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

32. Based on my training and experience, I know that wireless phone providers can collect cell-site data about cell phones to which they provide service. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. I have confirmed that Sprint maintains cell-site location information for up to five years.

33. Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to demonstrate communications between **Williams** and **Droughn** at and around the time of the purchase and transfer of the firearm and ammunition.

### IX. AUTHORIZATION REQUEST

34. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35. I further request that the Court direct Sprint to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Sprint, who will then compile the requested

records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. I am not requesting an order for sealing or nondisclosure. I have spoken with the Assistant U.S. Attorney assigned to this investigation, who indicated that the government will disclose to counsel for **Williams** and **Droughn** the search warrant application and related materials, as well as copies of the information provided by Sprint.